## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Michael N. Maruschak III, being duly sworn, depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation, and have been so employed since November 16, 2003. I have received extensive training in criminal law enforcement from the FBI Academy in Quantico, Virginia, including training in drug identification, drug distribution methods and law enforcement techniques related to drug trafficking. As an investigator, I have participated in arrests, search warrants and interviews of individuals involved in drug trafficking. I am currently assigned to a Asian organized crime criminal squad.

1. This affidavit is being submitted in support of an application for a warrant to search the following premises: xxxxxxxxxx, Washington, D.C. This property is more fully described below. The requested search is to include all rooms, closets and items found therein that may contain evidence, including items such as computers and other digital or electronic media as well as closed or locked containers. The purpose of this application is to seize evidence of violations of 18 U.S.C. § 1955.

2. All of the information contained in this affidavit is personally known by me or has been related to me by witnesses or other law enforcement officers involved in this investigation. This affidavit contains information necessary to support probable cause for the issuance of the search warrant. It does not include each and every fact and matter observed by me or known to the government.

3. As will be discussed in detail below, there is probable cause to believe that RICHARD KENNETH MAGAN has been conducting, financing, managing, supervising, directing, or owning all or part of an illegal gambling business, in violation of Title 18, United States Code, Section 1955. MAGAN also has a criminal record for illegal gambling. On October 21, 1984,

MAGAN was arrested by the Metropolitan Police Department in Washington, D.C. and charged with bookmaking. On November 9, 1984, he was convicted of that charge and was sentenced to less than one year of probation. On May 16, 2003, MAGAN was arrested in Arlington County, Virginia, and charged with conducting an illegal gambling operation, a felony. On July 1, 2003, he was convicted of permitting gambling on premises, a misdemeanor, and received a suspended sentence of twelve months in jail. On May 16, 2005, an arrest warrant was issued against MAGAN by United States Magistrate Judge Theresa Carroll Buchanan, Eastern District of Virginia based on a criminal complaint charging MAGAN with a violation of 18 USC 1955.

4. Investigation has revealed that RICHARD KENNETH MAGAN resides at xxxxxxxxx, Washington, D.C. Washington D.C. Department of Motor Vehicles records reflect that RICHARD KENNETH MAGAN's address is xxxxxxxxxxx, Washington, D.C. On Tuesday, March 29, 2005, RICHARD KENNETH MAGAN was observed departing the parking garage located at xxxxxxx, Washington, D.C. during the morning. Later that day, RICHARD KENNETH MAGAN was observed entering the parking garage located at xxxxxxxx, Washington, D.C.

Description of Place to Be Searched

xxxxxxxxxxxxxxx, Washington, D.C.

5. Xxxxxxxxxxxx is a multi-level condominium complex located on xxxxxxxx Avenue in the Northwest quadrant of Washington, D.C. xxxxxxxxxxxxxxxx Northwest. The building is located north of x Street and south of x Street. The building is also known as the xxxxxxxx Condominiums complex. The building has ten floors and its exterior is red brick. Unit xxx is located on the sixth floor of the building.

Information Provided by a Confidential Source

2

6.      The current investigation is being conducted by the FBI, Washington Field Office, Northern Virginia Resident Office, and the U.S. Attorney's for the Eastern District of Virginia and was opened after a confidential source (hereinafter referred to as CS) provided information to law enforcement in late 2004 concerning an illegal gambling enterprise operating in Prince William County, Virginia, within the Eastern District of Virginia. I have found CS to be a reliable source of information in this investigation because much of what CS has reported has been independently verified.

7.      CS stated that the illegal gambling enterprise (hereafter referred to as "the enterprise") involved sports betting and had been in existence for at least eight years. CS identified NICHOLAS JOHN FERLAZZO, JAMES VENEZIA and STEPHEN MATTHEW WOBLE as individuals who coordinated and supervised the activities of the enterprise. According to CS, the enterprise had many individuals who placed bets with the enterprise.

8.      CS advised that he was familiar with the enterprise and its practices because the CS had direct access to the enterprise for an extended period of time and personally observed FERLAZZO, VENEZIA, and WOBLE participate in the enterprise's illegal gambling activities.

9.      CS provided specific details concerning the enterprise's practices. CS explained that each bettor was assigned his own number and, when bets were placed, the bettor's number was used instead of his name. CS further reported that the enterprise utilized office space that had multiple telephone lines. Some of the telephone lines provided callers with a prerecorded outgoing message in which the latest "line information" was read. "Line information," in the case of sporting events, is generally the point spread. The line serves to equalize the competing teams so that the bettor may wager on the point spread of the contest rather than simply on the winner or loser. For example, a

bettor places a wager on the favorite (Team A) and the line is 3 points. Team A must win by more than three points for the bettor to win the wager. If Team B wins or if Team A does not win by more than three points, then the house wins and the bettor loses. If Team A wins by exactly three points, it is common for this outcome to be called a "push" and neither the bettor nor the house wins. It is known to investigators involved in gambling investigations that line information is generally obtained early during the day by a bookmaker from someone who is a specialist in determining the probable outcome of a sporting event. Bookmakers must furnish line information on a daily basis. This is necessary to stimulate business on betting activity and to enable the bookmaker to operate his business with the greatest chance of financial success. Heavy betting activity can influence bookmakers to adjust their lines.

    10.     CS also reported that the enterprise disseminated to its bettors on a regular basis printed guides (or pamphlets) that listed the upcoming sporting events. The prerecorded outgoing messages on the telephone lines devoted to providing the bettors with line information would detail the latest line information for each sporting event in the exact order in which the sporting events were listed on the printed guides. With the printed guides and the prerecorded line information, the bettor could then decide on which event(s) to place a wager.

    11.     CS further reported that the enterprise's office also had several telephone lines used exclusively for the placing and taking of bets. These telephone lines were answered by individuals who worked for the enterprise, hereafter referred to as operators. CS identified one of these operators as STEPHEN MATTHEW WOBLE. According to CS, when a bettor called an operator to place a bet, he would identify himself by his designated number, would specify the event or events on which he wished to place a wager, and the amount of the wager for each event. The operator then

recorded this information on a small piece of white paper. CS also reported that the telephone calls placed to the wager lines were recorded by the enterprise in case a bettor later disputed a wager.

12.  CS identified telephone number (703) xxxxxxxx as one of the telephone lines with a prerecorded outgoing message that provided bettors with current line information. CS identified telephone number (703) xxxxxxxx as one of the telephone lines used for the taking and placing of bets.

13.  CS stated that the weekly betting cycle began on Tuesday and ended the following Monday night. The bettors called the office during the designated office hours and placed their wagers. Typical office hours were Monday through Friday, 6:00 p.m. to 8:00 p.m.; Saturday and Sunday, 11:00 a.m. to 4:00 p.m. and 6:00 p.m. to 8:00 p.m. After the betting week ended, each bettor's weekly activity was computed. The bettors either received money from the enterprise if the bettor won that week or the bettor paid the enterprise if they lost. If the dollar amount was small, however, the enterprise "carried over" the balance because it was not worth the time of the enterprise or the bettor to meet and exchange money. If money was carried over, then the bettor entered the next betting cycle with either a credit or a debit. CS added that if money was not carried over, the enterprise paid the bettors on time and expected the bettors to pay on time. Regardless of the dollar amount of the payment to the bettor, the enterprise always paid in cash.

14.  CS reported that the manner in which the enterprise paid and collected depended on the dollar value associated with the bettor. If a lower-level bettor lost money to the enterprise, the bettor typically placed the amount of money he owed the enterprise in a white envelope and wrote his/her assigned number on the outside of the envelope. The bettor then left the envelope at a certain site located in Prince William County, Virginia. If the lower-level bettor won money from the

enterprise, then the bettor went to one of these sites and picked up an envelope which contained the bettor's winnings for the week. CS stated that larger-level bettors personally dealt with JAMES VENEZIA when paying or receiving money on previously placed bets. The money was placed in a white envelope with the large-level bettor's number written on it. These bettors telephonically arranged a meeting with JAMES VENEZIA and they met him at a designated location to exchange money. On occasion, large-level bettors would leave or pick up money at JAMES VENEZIA's residence. CS stated that JAMES VENEZIA always carried a black bag which contained money, a ledger and a handgun. The ledger contained all of the bettors' personal information and their betting winnings and/or losses.

15.  CS stated that although JAMES VENEZIA ran the day-to-day operations of the enterprise, NICHOLAS JOHN FERLAZZO was the individual in charge of the enterprise. NICHOLAS JOHN FERLAZZO's identity was only known to the enterprise's operators and large-level bettors. According to CS, NICHOLAS JOHN FERLAZZO met with JAMES VENEZIA every Tuesday morning to review the previous week's betting activity. NICHOLAS JOHN FERLAZZO gave JAMES VENEZIA the money to be paid to those bettors that won on their bets. CS stated that FERLAZZO had a safe deposit box at a bank.

Independent Evidence Corroborating Information Provided by CS

Subscriber Information on Telephones Identified by CS and Monitoring of Telephone Line with Outgoing Message that <u>Provides Line Information.</u>

16.  I have obtained subscriber information for telephone (703) 492-2252, which CS identified as a telephone line used by the enterprise to inform bettors of current "line information" by placing such information on a recorded outgoing message. Official records maintained by

Verizon South reflect the subscriber for telephone number (703) xxxxxxxx as NICK FERLAZZO. The billing address for (703) xxxxxxxx is P.O. Box xxxx Occoquan, Virginia, 22125. However, the records indicate that this telephone is physically located at xxxxxxxxxx, Woodbridge, Virginia 22191.

17. I have also obtained subscriber information for telephone (703) xxxxxx, which CS identified as a telephone line used for placing and taking bets. Records maintained by Verizon South reflect the listed subscriber for telephone number (703) xxxxxxxx as John Mastin. The billing address is xxxxxxxxx, Woodbridge, Virginia, which is the residence of JAMES VENEZIA. As with number xxxxx xxxxxxxx, the physical location of the telephone assigned number xxxxxxxxx is xxxxxxxxxxxx, Woodbridge, Virginia, 22191.

18. From February 3, 2005 through April 19, 2005, the outgoing recorded messages on telephone xxxxx xxxxxxxx were monitored and recorded by law enforcement on at least 27 occasions. On these recordings were voices of individuals who stated the office hours for the day, the teams designated as the "favorite" for each sporting event, and the point spread for each particular game. (Several of these recordings were played for CS. CS identified JAMES VENEZIA'S voice on the recording of the outgoing message providing line information on February 7, 2005. CS identified STEPHEN MATTHEW WOBLE'S voice on the recording of the outgoing message providing line information on February 12, 2005.)

Physical Surveillance of xxxxxxxxxxxxx <u>Woodbridge, Virginia</u>

19. Since both telephone lines used by the enterprise in connection with betting activity are physically located at xxxxxxxxxx, Woodbridge, Virginia, law enforcement suspected that the enterprise's betting operation was headquartered at that location and began to conduct surveillance

of that location. Physical surveillance of xxxxxxxxxxxxx, Woodbridge, Virginia, and evidence seized as a result of such surveillance, has confirmed that this location is in fact being used by the defendants to further the illegal gambling activities of the enterprise. The defendants have each been observed entering and exiting xxxxxxxxxxxxx, Woodbridge, Virginia, on numerous occasions. Specifically:

   a. From October 29, 2004 to April 24, 2005, JAMES VENEZIA was observed entering the door for xxxxxxxxxxxxx on at least 12 occasions and he was observed exiting the door on at least 16 occasions. On March 8, 2005, JAMES VENEZIA was observed entering the door for Suite #3. When investigators observed JAMES VENEZIA entering or exiting xxxxxxxxxx, he carried a black attache bag every time with only one exception.

   b. From October 29, 2004 to April 24, 2005, NICHOLAS JOHN FERLAZZO was observed entering the door for xxxxxxxxxx on at least 11 occasions and he was observed exiting on at least 12 occasions. On March 8, 2005, NICHOLAS JOHN FERLAZZO was observed entering the door for Suite #3.

   c. From October 29, 2004 to April 24, 2005, STEPHEN MATTHEW WOBLE was observed entering the door for xxxxxxxxxx on at least 22 occasions and he was observed exiting on at least 24 occasions.

   d. From October 29, 2004 to April 24, 2005, RICHARD KENNETH MAGAN was observed entering the door for xxxxxxxxxx on at least six occasions and exiting on at least six occasions. On March 8, 2005, RICHARD KENNETH MAGAN was observed entering Suite #3.

    e.    From October 29, 2004 to April 24, 2005, DANIEL ANTHONY MILLER was observed entering the door for xxxxxxxxxxx on at least six occasions and exiting on at least ten occasions.

    f.    From October 29, 2004 to April 24, 2005, SARA ELIZABETH BRUSH was observed entering the door for xxxxxxxxxxx on at least five occasions and exiting on at least 13 occasions. (Among the 27 recordings of outgoing messages on xxxxxxxxxxxxx, were two recordings with a woman's voice providing the line information on the outgoing message. The woman's voice was recorded by investigators on February 16 and February 19, 2005, and on those two days, SARA ELIZABETH BRUSH was observed in the parking lot of xxxxxxxxxx. On February 19, 2005, SARA ELIZABETH BRUSH was observed exiting the door for xxxxxxxxxx.)

    g.    From October 29, 2004 to April 24, 2005, BRYAN KEITH KNEPPER was observed entering the door for xxxxxxxxx on at least four occasions and exiting on at least ten occasions. On March 3, 2005, BRYAN KEITH KNEPPER was observed exiting Suite #3.

20.    Physical surveillance has also corroborated CS's information regarding the Tuesday morning meetings between FERLAZZO and VENEZIA. Physical surveillance has further revealed that RICHARD KENNETH MAGAN is also a frequent participant to these Tuesday morning meetings. For example:

    a.    During the morning hours on Tuesday, February 8, 2005, investigators conducting physical surveillance on xxxxxxxxxxxxxxxx, observed RICHARD KENNETH

9

   MAGAN arriving at xxxxxxxxxxx in his black Lincoln with District of Columbia license plate 828958. Several minutes later, VENEZIA was observed arriving at that location. After JAMES VENEZIA arrived, NICHOLAS JOHN FERLAZZO arrived at xxxxxxxxxxx Woodbridge, Virginia. All three individuals were present at xxxxxxxxxxx, Woodbridge, Virginia for over one hour.

 b. On Tuesday, February 15, 2005, investigators conducting surveillance observed JAMES VENEZIA, NICHOLAS JOHN FERLAZZO and RICHARD KENNETH MAGAN arrive and enter xxxxxxxxxx, Woodbridge, Virginia. All three individuals were present at that location for over one hour.

 c. On Tuesday, February 22, 2005, investigators observed NICHOLAS JOHN FERLAZZO and RICHARD KENNETH MAGAN arrive and enter xxxxxxxxxxx. Both individuals were present at xxxxxxxxxxxxx, Woodbridge, Virginia for over one hour.

 d. On March 8, March 22, March 29, and April 5, 2005 -- all Tuesdays-- investigators observed JAMES VENEZIA, RICHARD KENNETH MAGAN and NICHOLAS JOHN FERLAZZO arrive and enter xxxxxxxxxxxx, Woodbridge, Virginia in the morning. On all four of those occasions, VENEZIA, MAGAN and FERLAZZO were present at that location for over one hour.

21. Information provided by CS regarding the manner in which wagers were taken and recorded was also corroborated by physical evidence recovered as a result of physical surveillance. CS told investigators that the enterprise accepted wagers over the telephone and that the operators wrote the wagers on a small piece of white paper. CS also reported that the enterprise provided the

bettors with pamphlets containing upcoming sporting events and that the line information recorded on the outgoing message for telephone (703) 492-2252 provided the line information for the games in the same order listed on the pamphlets. CS further reported that when the sporting events were over for the day, each bettor's winnings or losses were recorded on a ledger.

22.    On March 5 and March 6, 2005, DANIEL ANTHONY MILLER and SARA ELIZABETH BRUSH were observed by investigators departing xxxxxxxxx, Woodbridge, Virginia. On both days, DANIEL ANTHONY MILLER walked to the dumpster located near the building and placed garbage bags inside the dumpster. Investigators recovered the items placed in the dumpster by DANIEL ANTHONY MILLER. Over 100 pieces of paper measuring 4.25 inches by 5.5 inches were recovered during these two trash searches. These pieces of paper appear to be betting slips. At the top of most of the slips was a hand-written number. On the left side of the slips were hand-written letters that designated a team and across from the letters were numbers. For example, one slip had "113" at the top with "DAL -2 ½" on the left and "250" on the right.

23.    Also recovered from the garbage bags that MILLER placed in the dumpster on March 5, 2005, was a "Premium Sports Schedule" for the period February 22 to March 14, 2005. This booklet, which looked like a magazine, contained daily schedules for college and professional basketball games for the period February 22, 2005, through March 14, 2005. On February 23, 2005, an investigator recorded the outgoing message on xxxxxxxxxxxxxx, the line devoted to providing bettors with line information. On May 11, 2005, the recording from February 23, 2005, was compared to the schedule for February 23, 2005, in the "Premium Sports Schedule" recovered on March 5, 2005. The schedule listed 11 professional basketball games and 39 college games that were to take place that day. The recording made on February 23, 2005, listed the favorite team and

the point spread in the exact order that each game was listed in the "Premium Sports Schedule." At one point on the recording, the person providing the line information stated "skip a game" and that statement corresponded exactly with the Toledo versus Ball State game. Additionally, the recording announced that the final game was postponed. The "Premium Sports Schedule" listed the final game as USC versus UCLA. A check of the USC athletics website indicated that USC played UCLA on February 24, 2005 and not February 23, 2005.

24.    Also recovered from the trash bags that MILLER placed in the dumpster on March 5 and March 6, 2005, were several pages of a computer-generated spreadsheet. Across the top of the spreadsheet were the dates "3/1/05" through "3/7/05." The far left column of the spreadsheet listed the first names of individuals and the second column listed a unique number for each individual. The third column had the heading "Balance" and there were dollar amounts for many of the individuals listed on the spreadsheets. Some of the numbers throughout the spreadsheet were in red ink and others were in black. Based on law enforcement experience and the information from CS, it is believed that this spreadsheet was the ledger used by the enterprise to track the bettors' winnings and losses for the first week in March.

25.    Physical evidence corroborating CS's information was also recovered from the trash on March 22, 2005. On that day, JAMES VENEZIA was observed departing xxxxxxxxxxxxx, Woodbridge, Virginia with a trash bag in his hand. JAMES VENEZIA entered his vehicle and drove south on xxxxxxx and was observed driving behind the stores of the Marumsco Plaza strip mall. A few minutes later, JAMES VENEZIA appeared on Longview Drive and he turned and drove south on Route 1. Investigators then drove behind Marumsco Plaza and discovered a trash bag that appeared to be the same trash bag that JAMES VENEZIA was observed carrying when he exited

xxxxxxxxxxxxxxx. The trash bag contained many items, including over 170 betting slips similar to those recovered on March 5 and 6, 2005; two white envelopes, one with #43 on it and one with #113 on it, and five weeks worth (five pages per week) of a computer-generated ledger dating from February 1, 2005 to March 7, 2005. The computer-generated ledger was similar to the one recovered on March 5 and 6, 2005 in that it reflected the bettors' first names and their numbers on separate columns. However, rather than having red or black print for dollar amounts, the amount of winnings and losses were hand-written. Each participating bettor's balance, which was denoted by a positive or negative sign immediately preceding an amount, was reflected per day and then the final balance (positive or negative) for the week was reflected on the last column of the ledger. On these computer generated-ledgers, there was bettor and balance information for every day from February 1 to March 7.

26. More physical evidence of the gambling enterprise was recovered on April 24, 2005. On that evening, BRYAN KEITH KNEPPER was observed exiting xxxxxxxxxxxxx and placing a trash bag in the dumpster on the side of the building. Investigators recovered the trash bag and discovered more than 140 betting slips and two Wachovia Bank envelopes with numbers written on them.

<u>There is Probable Cause to Believe that Evidence of Illegal Gambling is Presently Located at Magan's Residence</u>

27. Title 18, United States Code, Section 1955 defines "illegal gambling business" as a gambling business which (1) is a violation of the law of the State or political subdivision in which it is conducted; (2) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and (3) has been or remains in substantially continuous operation

for a period in excess of thirty days or has a gross revenue of $2,000 in any single day. The term "gambling" for purposes of Title 18, United States Code, Section 1955 includes, but is not limited to, conducting numbers games or selling chances therein.

28.  The illegal gambling business described in this affidavit was conducted in the Commonwealth of Virginia. Section 18.2-328 of the Virginia Code provides that the operator of an illegal gambling enterprise, activity or operation shall be guilty of a Class 6 felony. An "operator" for purposes of Section 18.2-328 includes any person or association of persons who conducts, finances, manages, supervises, directs or owns all or part of an illegal gambling enterprise, activity or operation. Section 18.2-328 further provides that any operator of an illegal gambling enterprise who engages in an illegal gambling operation which (i) has been or remains in substantially continuous operation for a period in excess of thirty days or (ii) has gross revenue of $2,000 or more in any single day shall be imprisoned not less than one year but not more than ten years.

29.  Based on the foregoing, there is probable cause to believe that from in or about late, 2004 until the present, in Prince William County, Virginia, within the Eastern District of Virginia, RICHARD KENNETH MAGAN along with NICHOLAS JOHN FERLAZZO, JAMES VENEZIA, STEPHEN MATTHEW WOBLE, DANIEL ANTHONY MILLER, SARA ELIZABETH BRUSH and BRYAN KEITH KNEPPER conducted, financed, managed, supervised, directed, or owned all or part of an illegal gambling business that (1) violated the law of the Commonwealth of Virginia; (2) involved five or more persons who conducted such business; and (3) remained in substantially continuous operation for a period in excess of thirty days. Accordingly, there is probable cause to believe that MAGAN has violated Title 18, United States Code, Section 1955.

30.  Based upon my experience and training, I know the following:

    a.    That it is also common for persons involved in illegal gambling enterprises to use and maintain personal notes, ledgers, records, receipts, phonebooks, notebooks, day planners, palm pilots, calendars and other papers in which to document gambling activity and events;

    b.    That those involved in illegal gambling enterprises often maintain such records and items in secure locations within their residences, automobiles, businesses, and storage facilities for their ready access and to conceal such evidence from law enforcement authorities;

    c.    That it is common for persons involved in illegal gambling enterprises to secret the proceeds of the enterprise in secure locations within their residences, automobiles, businesses, and storage facilities for their ready access and to conceal the proceeds from law enforcement authorities;

    d.    That it is also common for persons involved in illegal gambling enterprises to use computers to store information concerning the enterprise on a computer.

31.    Because individuals involved in illegal gambling enterprises often utilize their computers to facilitate their gambling activities, authorization is requested to also search and seize any computer equipment, electronic storage devices, and peripheral devices. Searching and seizing computers often require investigators to seize all peripherals (e.g. scanners, printers) and electronic storage devices (e.g. hard disks, diskettes, tapes, laser disks, CD-ROM's) to be searched later by a qualified expert in a controlled environment due to the complex way in which information is stored in or by computers. In order to fully retrieve data from the aforementioned electronic storage media

and computers, the computer expert needs all electronic storage devices and the central processing unit (CPU).

  32. Based on the foregoing, there is probable cause to believe that evidence, fruits and instrumentalities of the foregoing violation are presently located at xxxxxxxxxxx, Washington, D.C. This application requests authority to search this location for such evidence and also to seize and search items found therein that may contain such evidence.

  FURTHER YOUR AFFIANT SAITH NOT.

            _____
            Michael N Maruschak III
            Special Agent
            Federal Bureau of Investigation

Subscribed and sworn before me this _____ of May, 2005

_____
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A - LIST OF ITEMS TO BE SEIZED AND SEARCHED**

Any and all items found inside the premises to be searched that may contain evidence, fruits and instrumentalities of violations of 18 U.S.C. § 1955, including the following items:

1. Books, records, receipts, notes, betting slips, ledgers and other papers, including any computerized or electronic records, relating to the operations of an illegal gambling enterprise.

2. Documents, books and papers, including any computerized or electronic records, reflecting the names, addresses and/or telephone numbers of possible participants in the illegal gambling enterprise.

3. Books, records, receipts, bank statements and records, money drafts, credit cards, credit card statements, letters of credit, wire transfers, money orders, cashier's checks, receipts, pass books, bank checks, tax returns, and any other items evidencing the obtaining, secreting, transferring, concealment and/or expenditure of money.

4. Electronic equipment, such as telephone answering machines, telephone paging devices, currency counting machines and any information stored in memory or contained in any related hardware and software.

5. Computer equipment, peripherals and electronic storage media, including any and all electronic data stored on a computer hard drive, diskettes, tapes, and other medica capable of storing information in a form readable by computer. Computer equipment and peripherals include, but are not limited to, tapes, cassettes. cartridges, streaming tape, commercial software, and hardware, computer disks, disk drives, monitors, computer printers, system disk operating systems, magnetic media floppy disk, tape systems and hard drive and other computer related operation equipment.

6. United States currency, precious metals, jewelry and financial instruments, including, but not limited to stocks and bonds.

7. Photographs, in particular, photographs of participants in the illegal gambling enterprise and their assets.

8. Audio tapes.

9. Firearms.

10. Indicia of occupancy, residency and/or ownership of the premises to be searched and/or other assets, including but not limited to utility and telephone bills, cancelled envelopes and keys.

11. Any locked and/or closed containers believed to contain any of the above listed evidence.